UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL ALLEN SPEAR,

                      Plaintiff,

         v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

                                      DECISION & ORDER

                                      13-CV-6017P

## PRELIMINARY STATEMENT

        Plaintiff Michael Allen Spear ("Spear") brings this action pursuant to Section 205(g) of the Social Security Act ("SSA"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States Magistrate Judge.  (Docket # 13).

        Currently before the Court is Spear's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket # 10).  Spear requests that the Court reverse the judgment of the Commissioner and remand for calculation of benefits or for further administrative proceedings.  (*Id.*).  Also pending before the Court is the Commissioner's motion for judgment on the pleadings.  (Docket # 7).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

---

[1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

## BACKGROUND

### I.      Procedural Background

Spear applied for DIB on August 24, 2009, alleging disability beginning on May 25, 2005, due to a herniated disc contacting a nerve root, post-traumatic stress disorder ("PTSD"), anxiety disorder, high blood pressure, acid reflux and degenerative disc disorder. (Tr. 97, 102, 119).[2]  On February 9, 2010, the Social Security Administration denied Spear's claim for benefits, finding that he was not disabled. (Tr. 61-64). Spear requested and was granted a hearing before Administrative Law Judge Michael W. Devlin (the "ALJ"). (Tr. 65-66, 77-93). The ALJ conducted a hearing in Rochester, New York on April 28, 2011. (Tr. 38-53). Spear was represented at the hearing by his attorney, Kelly Laga, Esq. (Tr. 38, 96). In a decision dated July 8, 2011, the ALJ found that Spear was not disabled and was not entitled to benefits. (Tr. 20-29).

On November 26, 2012, the Appeals Council denied Spear's request for review of the ALJ's decision. (Tr. 1-5). Spear commenced this action on January 9, 2013 seeking review of the Commissioner's decision. (Docket # 1).

### II.      Non-Medical Evidence

#### A.      Spear's Application for Benefits

Spear was born on January 7, 1971 and is now forty-three years old. (Tr. 115). Spear graduated from high school in 1990 and attended BOCES in 1990. (Tr. 124). Spear previously worked as a maintenance technician in the military from 1995 through 2005. (Tr. 120). At the time of his application, Spear was taking Atenolol to control his high blood pressure, Ambien to assist his sleep, Cymbalta to address his PTSD, anxiety and depression,

---

[2]  The administrative transcript shall be referred to as "Tr. __."

Methadone and Salsalate to alleviate his pain, and Omeprazole and Doccusat to address digestive issues. (Tr. 123). According to Spear, the Methadone made him drowsy. (*Id.*).

At the time of his application, Spear reported that he spends his days watching television, reading, or using the computer. (Tr. 127). Spear reported that he enjoys reading, watching television, playing video games, assembling and painting plastic car models, and playing musical instruments. (Tr. 130). According to Spear, he is able to prepare simple meals daily and goes grocery shopping once a month for approximately one hour. (Tr. 127-28). Spear is able to care for his personal hygiene, although he experiences pain while shaving if he stands for too long. (Tr. 127-28). In addition, Spear is able to complete simple household chores including laundry, but needs assistance to complete more involved household chores such as vacuuming, mopping, sweeping or yard work. (Tr. 129).

Spear leaves his house three to four times per week or as needed to attend medical appointments. (Tr. 129, 131). Spear reports that he is not very social because he has difficulty going places due to his walking limitations and his difficulty traveling in automobiles. (Tr. 131). According to Spear, he has a driver's license, but is unable to drive because of his anxiety traveling in automobiles. (Tr. 129). Spear reported that he experiences occasional anxiety or panic attacks when traveling in automobiles. (*Id.*).

According to Spear, he is unable to walk, stand or sit for long periods of time, frequently experiences pain and has difficulty sleeping, often awakening two to six times each night. (Tr. 127). Spear reports that he has trouble lifting anything heavier than ten pounds and has difficulty climbing stairs, kneeling, squatting and reaching. (Tr. 131). According to Spear, he uses a cane to ambulate, and when his pain is very bad, he uses a walker that was prescribed by his doctor. (Tr. 132). Spear reports that he can walk approximately 100 yards before needing

to rest for ten minutes.  (*Id.*).  According to Spear, he does not have any problems getting along with others, but has difficulty dealing with stress.  (Tr. 132-33).

Spear reports that he began experiencing pain in his back in August 2003.  (Tr. 134).  According to Spear, the pain is centered in his lower back, but radiates to the sides of his back, up his spine and down his left leg.  (*Id.*).  Spear described the pain as sharp, stabbing, burning and "like electricity flowing."  (*Id.*).  Spear also experiences numbness, pain and pressure in his left leg.  (*Id.*).  According to Spear, he experiences pain that varies in intensity without identifiable triggers.  (Tr. 135).  Spear takes Methadone, but reports that it does not alleviate his pain.  (*Id.*).  According to Spear, the Methadone does not cause any side effects. (*Id.*).

**B.**      **The Disability Analyst's Assessment**

On January 25, 2010, disability analyst C. Cusmano ("Cusmano") completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 54-59).  Cusmano opined that Spear could occasionally lift twenty pounds and could frequently lift ten pounds.  (Tr. 55). According to Cusmano, Spear could stand or walk for about six hours during an eight-hour workday and could sit for about six hours in an eight-hour workday.  (*Id.*).  According to Cusmano, Spear had no limitations in his ability to push or pull.  (*Id.*).  Cusmano opined that Spear did not have any further physical limitations.  (Tr. 56-57).

**III.**   **Relevant Medical Evidence[3]**

**A.**      **Physical Health Treatment Records**

On September 12, 2007, Spear attended an appointment with physician's assistant Laurie Thiele ("Thiele") at the Veteran's Affairs Medical Center ("VAMC").  (Tr. 202-03).

---

[3]   Those portions of the treatment records that are relevant to this decision are summarized herein.

During the appointment, Spear requested an increase for his 40% service-connected spine condition, reporting "pain all the time, usually a 9/10," and appeared unable to stand erect. (*Id.*). The treatment record reflects that Spear was being treated at the pain management clinic by Jackie Coates ("Coates"), a nurse practitioner, who had prescribed Percocet to manage Spear's pain. (*Id.*). According to Spear, he had been experiencing increased back pain for the past year and one-half and had decreased mobility. (*Id.*). Spear reported experiencing "flareups" five to ten times per day that could last anywhere from seconds to fifteen minutes, which were occasioned by grabbing, and intense pain in the middle back, prohibiting him from walking. (*Id.*). Spear had started using a walker to compensate due to an increased weakness in his left leg and to prevent himself from falling. (*Id.*). Spear reported that he could bathe and dress himself, but could only walk 100-200 feet before having to stop and rest. (*Id.*). According to Spear, his painful condition prevented him from performing any occupation that required sitting, standing, lifting, twisting or bending. (*Id.*).

Thiele reviewed a September 7, 2006 MRI that revealed a "slight disc bulge at L4-L5" and a "moderate disc protrusion S1." (*Id.*). Upon examination, Thiele noted that Spear walked "flexed forward in obvious discomfort." (*Id.*). Thiele observed an "obvious left paravertebral spasm at L3 to sacrum level" and limited range of motion due to pain. (*Id.*). Although Spear could flex forward to 70 degrees, he did so in pain. (*Id.*). Spear reported decreased sensation over his entire left leg. (*Id.*). Thiele diagnosed Spear with a lumbar strain. (*Id.*). Thiele further noted that the generalized location of numbness in Spear's left leg was inconsistent with lumbar radiculopathy, which causes specific areas of the leg to be affected. (*Id.*).

On April 2, 2008, Spear attended a pain management appointment with Coates. (Tr. 254-56).  During the appointment, Spear stated that he experiences some periods of improved pain and that he was not currently experiencing any leg pain.  (*Id.*).  Spear rated his current continuous back pain as a ten out of ten and described the pain as "burning and tingling." (*Id.*).  According to Spear, his pain gets worse in cold weather, and affects his sleep, appetite, emotions, physical activity, concentration and social relationships.  (*Id.*)

Coates noted that Spear suffers from chronic lower back pain and degenerative and herniated L5-S1 disc.  (*Id.*).  According to Coates, Spear reported worsening symptoms despite the absence of EMG findings and two neurosurgical opinions that Spear was not a surgical candidate.  (*Id.*).  According to Coates, Spear continued to use a walker to ambulate and reported that his pain prohibited him from walking without the assistance of the walker.  (*Id.*). Coates prescribed Capsaicin cream for pain.  (*Id.*).  At the time, Spear's pain medications included Duloxetine, Salsalate and Morphine, and he was taking Prednisone for inflammation. (*Id.*).  Over the course of the next eight months, Spear regularly renewed his Morphine prescription.[4]  (Tr. 313-35)*.*

On January 6, 2009, Spear returned to the pain management clinic for an evaluation.  (Tr. 228-32).  Spear was evaluated by Igor W. Rosien ("Rosien"), MD.  (*Id.*).  Spear reported that his back pain began in 1998 when he awoke and was unable to get out of his bed. (*Id.*).  According to Spear, he was treated with injections for Lidocaine.  (*Id.*).  Two years later, Spear experienced a similar incident which resolved after approximately ten days.  (*Id.*).  In August 2003, when he was in the Navy, he was in a motor vehicle accident which re-injured his back.  (*Id.*).

---

[4]  Spear renewed his prescriptions on 4/30/2008, 6/4/2008, 7/9/2008, 8/8/2008, 10/15/2008 and 12/22/2008. (Tr. 313-35).

Spear reported chronic, continuous pain and that he was unable to tolerate driving or cold weather. (*Id.*). Since his last appointment at the pain management clinic in April 2008, Spear claimed that his pain had been more or less the same, with some periods of improved pain during the day. (*Id.*). He said the pain was still centered in his lower back and was occasioned by episodic "jolts" of pain that were intense and severe and would radiate down his left leg if he attempted to straighten his back. (*Id.*). Spear reported that repositioning did not help reduce the pain and rated his sleep quality as poor. (*Id.*). Spear rated his pain as a seven out of ten at the time of the evaluation. (*Id.*).

Rosien reviewed the results of a November 2006 MRI of Spear's spine. (*Id.*). According to Rosien, the images revealed loss of normal lordotic curvature of the lumbar spine with straightening, and desiccation of disc material at L5-S1. (*Id.*). In addition, there was a slight disc bulge at L4-L5 with a "slight mass effect over thecal sac and slight narrowing of neural foramina with a moderate size left posterolateral disc protrusion with posterior and central extension causing mild compression of the left S1 nerve root." (*Id.*). According to Rosien, there had been "mild progression in size of the protruded disc" and "mild bilateral narrowing of neural foramina at L5-S1" compared with previous examinations. (*Id.*). Upon examination, Spear exhibited visible pain behavior, including difficulty when trying to stand, sit, or ambulate, but also appeared to have a steady gait. (*Id.*). Rosien noted that Spear used a cane to ambulate. (*Id.*). Rosien's plan for Spear was to continue on his current analgesic regimen and recommended that Spear purchase Melatonin over the counter to help with sleep. (*Id.*).

On May 5, 2009, Spear attended an appointment with Rebecca A. Drayer ("Drayer"), MC, M.Sc. (Tr. 221-24). Treatment notes indicate that Spear previously received treatment from Dr. Eckert, but had been reassigned to Drayer for primary care. (*Id.*). Spear's

chief complaint was back pain resulting from an automobile accident that occurred in 2003.

(*Id.*).  Spear reported that his pain medications were not managing his pain and that he had

previously attempted physical therapy and chiropractic treatments, but that they had aggravated

his pain.  (*Id.*).  Spear was still having issues sleeping and walking.  (*Id.*).  During the

appointment, Spear used a cane and appeared to be in some discomfort.  (*Id.*).  Drayer suggested

that Spear may have to begin taking Ambien to help him sleep, and concluded that another

evaluation by Rosien was necessary to reevaluate his pain medication.  (*Id.*).

Spear met with Rosien six days later on May 12, 2009.  (Tr. 216-20).  Spear

reported that he had not improved since his last visit and that the Morphine was ineffective and

was not "touching the pain."  (*Id.*).  Spear was not interested in increasing the dosage of the

Morphine and reported more issues sleeping despite using Melatonin.  (*Id.*).  Spear rated his pain

as an eight out of ten at the time of the appointment and demonstrated difficulty in standing and

sitting.  (*Id.*).  Unlike his last appointment with Rosien, where his gait appeared steady, Spear

exhibited an antalgic gait.  (*Id.*).  Rosien recommended an acupuncturist and substituting

Methadone for Morphine to manage Spear's pain.  (*Id.*).  The treatment notes provide a rating for

service connected impairments.  (*Id.*).  The notes indicate a forty percent lumbosacral or cervical

strain rating, a ten percent hypertensive vascular disease rating, a zero percent hiatal hernia

rating, and a thirty percent major depressive disorder rating, concluding with a sixty percent total

service connection rating.  (*Id.*).

On the same date, Spear met with registered nurse Lynn M. Bement ("Bement")

for a comprehensive pain examination.  (Tr. 215-16).  Spear reported that his pain began in 1998

and rated it to be a ten out of ten, at worst, and an eight out of ten, at best.  (*Id.*).  He claimed he

could live with pain at a level of five out of ten.  (*Id.*).  Spear described the pain as "aching,

8

burning, pressure, shooting, stabbing, throbbing." (*Id.*).  According to Spear, nothing alleviates

his pain, which interferes with his ability to work, concentrate, sleep and perform physical

activities.  (*Id.*).  The next day, May 13, 2009, Coates prescribed a conversion from Morphine to

Methadone, at a rate of 5mg every eight hours.  (Tr. 220).

       Spear attended a follow-up appointment with Rosien on June 23, 2009 to monitor

his progress since beginning Methadone.  (Tr. 210-14).  Spear reported no improvement despite

taking Methadone and continued difficulty sleeping.  (*Id.*).  Spear reported his pain as a seven

out of ten.  (*Id.*).  Upon examination, Spear demonstrated difficulty standing and sitting,

exhibited an antalgic gait, and used a cane.  (*Id.*).  Rosien increased Spear's Methadone dosage to

10mg, recommended that Spear attend an appointment with a PTSD therapist, and referred Spear

to Behavioral Sleep Medicine.  (*Id.*).  He also referred Spear to an acupuncturist.  (*Id.*).

       On October 30, 2009, Spear met with Francis E. Skea, RN, for a comprehensive

pain assessment.  (Tr. 207-08).  Spear rated his pain at six out of ten, claiming it was at its worst

at eight out of ten and its best at five out of ten.  (*Id.*).  Again, Spear rated the pain he could live

with as a five and claimed his pain was continuous, made worse when he moved, and inhibited

his physical activity, relationships with others and enjoyment of life.  (*Id.*).

       That same day, Spear met with Coates and reported that acupuncture and

medicine had been helpful in counteracting the pain.  (Tr. 205-07).  Coates increased Spear's

Methadone dosage to 15mg in the morning, 10mg eight hours later, and 10mg at bedtime.  (*Id.*).

In addition, she referred Spear for a sleep study and EKG.  (*Id.*).

       Spear met with Rosien for a pain management evaluation on January 12, 2010.

(Tr. 412-17).  Spear reported that the acupuncture had provided improvement, but that he was

unable to maintain attendance due to "other commitments." (*Id.*).  Spear claimed there had been

no improvement with his pain management since October 2009 and rated his pain at eight out of ten. (*Id.*).  He stated that he was experiencing increased pain involving the lower lumbar, midline, and left paraspinal regions. (*Id.*).  His left leg was twitching, increasingly weak, and causing problems with his balance, especially upon transitioning from an upright to supine position. (*Id.*).  Upon examination, Spear exhibited pain behaviors and appeared uncomfortable sitting upright and was positive for an antalgic posture and gait. (*Id.*).  Spear demonstrated difficulty sitting and needed to use his arms to rise from a seated position. (*Id.*).  Spear was unsteady while seated on the examination table and had to use his cane for balance. (*Id.*).

Spear's back was tender upon palpation and had restricted range of motion in all directions due to pain. (*Id.*).  Spear performed straight leg raises without symptoms, but was unable to perform heel or toe walks without falling. (*Id.*).  Spear had a slightly wide gait that required the use of a cane. (*Id.*).  The results of the examination caused Rosien to be concerned that Spear's back impairment had progressed, and he recommended another MRI with spring flex/extension films and that Spear return to regular acupuncture. (*Id.*).  Rosien also increased Spear's Methadone to 15mg throughout the day. (*Id.*).

On January 15, 2010, Spear was evaluated by consultative physician Sandra Boehlert ("Boehlert"), MD.  (Tr. 340-44).  Spear complained of low back pain that intermittently radiates into his left leg. (*Id.*).  He claimed that the pain had become much more severe over the last year and that since 2003 he had been unable to bend and twist, or lift heavy objects due to his back pain. (*Id.*).  Spear reported that he lived with his mother and was able to clean, cook, shower, bathe, dress, wash his laundry and shop once a week. (*Id.*).  Spear stated that he enjoys watching television, reading and building model cars. (*Id.*).

Upon examination, Boehlert noted that Spear's gait and stance were normal and he did not appear to be in acute distress. (*Id.*). Spear was able to walk on his heels and toes without difficulty, could fully squat and did not use any assistive devices. (*Id.*). Boehlert noted that Spear needed no assistance changing for the examination or to get on or off the examination table and was able to rise from his chair without difficulty. (*Id.*).

Boehlert noted that Spear's cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. (*Id.*). Boehlert identified no scoliosis, kyphosis or abnormality in the thoracic spine. (*Id.*). Boehlert found that Spear's lumbar flexion was limited to 75 degrees, and that his lateral flexion to left was limited to 20 degrees but was unlimited to the right. (*Id*). Similarly, Spear's lumbar spine rotation was limited to 20 degrees to the left with full rotation to the right. (*Id.*). The straight leg raise was positive on the left side sitting at 90 degrees and lying down at 30 degrees. (*Id.*). Boehlert found full range of motion in the shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally. (*Id.*). Spear demonstrated 5/5 strength bilaterally in his upper and lower extremities. (*Id.*). Boehlert also reviewed a January 15, 2010 x-ray of Spear's lumbar spine, which demonstrated well-maintained disc spaces and intact pedicles. (Tr. 344). The radiologist's impression was a "negative study." (*Id.*).

Boehlert assessed that Spear suffered from left lumbar radiculopathy, hypertension, gastroesophageal reflux disease and a psychological disorder. (*Id.*). Boehlert opined that Spear's prognosis was fair and he had moderate to marked limitations for repetitive bending, twisting or heavy exertions in the standing position. (*Id.*). Boehlert recommended reevaluation in two years if surgical treatment, which could improve the limitations, was provided. (*Id.*).

11

On February 2, 2010, x-rays of Spear's lumbosacral spine were taken.  (Tr. 377-78).  The radiologist, Luciano Castillo, compared the images to the images taken in 2006 and opined that there was no interval change.  (*Id.*).  He noted that there was no evidence of subluxation with flexion and extension, and the vertebral bodies maintained normal alignment.  (*Id.*).  The bone mineralization and structure were normal, and the disc spaces were symmetrical in appearance.  (*Id.*).  Castillo concluded that there was no radiographic evidence of spinal instability.  (*Id.*).

Spear met with Rosien again on March 30, 2010.  (Tr. 408-12).  Since the January appointment, Spear reported unchanged pain in his lower back, but decreased pain and increased "heavy pressure" on his left leg.  (*Id.*).  He also felt that his left leg had become weaker.  (*Id.*).  Upon examination, Spear demonstrated minimal pain behavior, including grimacing, difficulty sitting and rising, and frequent shifting.  (*Id.*).  His posture and gait were antalgic, and he used a cane when walking.  (*Id.*).  Rosien observed moderate midline vertebral/intervertebral tenderness at L4/L5.  (*Id.*).  Spear was unable to lift on his heels or toes and was unable to tandem walk, and Rosien found slightly diminished strength in Spear's left quadriceps and hamstrings (4/5 rating) versus his right (5/5 rating).  (*Id.*).

Rosien reviewed a report of an MRI conducted on March 15, 2010 that demonstrated a "left paracentral disc protrusion centered on a broad based disc bulge that indents the ventral thecal sac and encroaches on the exiting nerve root" at the L5-S1 level, resulting in "moderate left lateral recess stenosis and mild central canal stenosis."  (*Id.*).  In addition, there was "disc osteophyte complex and facet hypertrophic change," which resulted in "moderate right and moderate left-sided neural foraminal narrowing."  (*Id.*).  According to Rosien, the report suggested progression of the radiographic findings at the L5-S1 level, but it was difficult for

Rosien to make an assessment because he did not have the images. (*Id.*). Rosien noted that the lumbar x-rays did not reveal instability. (*Id.*). Rosien opined that Spear would need to undergo another "EMG/NCS" to determine whether there was evidence of lumbosacral radiculopathy before he could be referred to a neurosurgeon. (*Id.*).

Spear met with Drayer, his general physician, on April 23 and May 7, 2010, to discuss abdominal pain and nausea. (Tr. 400-07). In both appointments, he appeared in no acute distress and his analgesic regimen remained unchanged. (*Id.*).

Spear returned for a pain clinic appointment with Rosien on July 6, 2010 and reported slightly worsened lower back and left leg pain, with short bursts of sharp pain and a "heavy pressure" on his leg. (Tr. 394-98). His left leg also felt weaker than his right, which continued to create issues when walking. (*Id.*). Spear rated his pain as a seven out of ten and appeared uncomfortable, exhibiting pain-related behavior. (*Id.*). Rosien increased Spear's Methadone dosage from 15mg to 20mg. (*Id.*). Rosien noted that Spear was scheduled for an EMG study on July 26, 2010. (*Id.*).

On September 14, 2010, Spear met with Drayer for a follow-up appointment. (Tr. 392-94). In addition to complaints about abdominal pain and nausea, Spear noted that his low back pain was still bothering him and that he was denied disability because "they thought he could lift and carry light amounts such as 10-20 pounds." (*Id.*). Spear indicated that even carrying a gallon of milk from the car to his house causes significant pain. (*Id.*).

On October 18, 2010, Spear attended another appointment with Rosien. (Tr. 386-91). During the appointment, Spear reported increased back and leg pain since his last appointment. (*Id.*). Spear rated his pain intensity at an eight out of ten and reported frequent sharp pains down his left leg in a sciatic pattern, with periodic tingling. (*Id.*). Spear reported

increased difficulties in gait and balance, complaining that he was more unsteady than before and that he continued to rely on a cane to walk.  (*Id.*).  Further, Spear reported new symptoms in his right leg, beginning approximately two weeks before the appointment.  (*Id.*).  According to Spear, he experienced intermittent pain radiating "down the lateral/posterior aspect of [his] upper leg to just above the knee" and stated "the pain occurs unrelated to the severity of the back pain." (*Id.*).

According to Rosien, these symptoms were consistent with Spear's March 15, 2010 MRI, which revealed "some . . . moderate right and left-sided neural foraminal narrowing due to disc osteophyte complex and facet hypertrophic changes."  (*Id.*).  Rosien noted that Spear's July 26, 2010 EMG study revealed "borderline normal with no definite electrophysiologic evidence for a lumbosacral radiculopathy on the left."  (*Id.*).  Rosien determined that because Spear's symptoms and Rosien's findings appeared to correlate with the anatomic imaging result, he would refer Spear to a neurosurgeon for further evaluation and to assess whether surgery was appropriate.  (*Id.*).  Rosien did not alter Spear's analgesic regimen because Spear reported "that he felt his pain was manageable on the current analgesic regimen." (*Id.*).

Spear and Rosien met again on February 7, 2011.  (Tr. 427-28).  Spear reported "no significant interval change of his symptoms nor reduction in pain intensity" since his last appointment with Rosien in October of 2010.  (*Id.*).  He rated his pain as a seven out of ten, continued to complain of sharp pains down his left leg and denied lower extremity numbness. (*Id.*).  He also continued to have intermittent radicular pain involving the lateral/posterior right upper leg.  (*Id.*).  Spear claimed his current analgesic regimen was resulting in a moderate reduction in pain intensity.  (*Id.*).  Rosien reiterated Spear's need for surgical evaluation, but

noted that Spear was unable to obtain transportation to Syracuse.  (*Id.*).  Accordingly, Rosien

referred Spear to Dr. Everett at the University of Rochester Spine Institute.  (*Id.*).  Spear

requested an increase in his Methadone dosage, but Rosien declined.  (*Id.*).  Rosien

recommended that Spear return for a follow-up appointment in three months.  (*Id.*).

      **B.**    **Mental Health Treatment Records**

      On October 8, 2008, Spear was interviewed by Denise A. Asandrov, a social

worker.  (Tr. 247-50).  Spear reported that he graduated from high school in 1990 and worked at

several different jobs until he enlisted in the Navy in 1995.  (*Id.*).  His previous employment

included dish washer, maintenance manager, cashier and stock boy.  (*Id.*).  According to Spear,

he was in a motor vehicle accident in August 2003 and has experienced severe back pain since

the accident.  (*Id.*).  Spear reported that he was discharged from the Navy in 2005 against his

wishes because he could not perform his duties.  (*Id.*).  Spear stated that he has not worked since

his discharge because no one would hire him.  (*Id.*).  According to Spear, he cannot stand or sit

for prolonged periods and experiences anxiety in automobiles.  (*Id.*).

      Spear stated that he lived with his mother and has five children but had not seen

them since 2003.  (*Id.*).  Spear is engaged to his girlfriend of seven months, and he talks to her on

the phone daily.  (*Id.*).  Spear reported that he does not have any friends and spends his days

watching television and taking online courses.  (*Id.*).

      Spear reported that he only leaves the house once or twice per month because he

has difficulty traveling in automobiles.  (*Id.*).  According to Spear, he experiences anxiety and

sometimes has major or minor panic attacks when he is in a car.  (*Id.*).  During the attacks,

Spear's "heart pounds," he has difficulty breathing and shakes.  (*Id.*).  Spear described feeling

"locked in a cage" and fears being in another accident.  (*Id.*).  Spear is unable to drive, has

accident-related nightmares approximately five times per month and has difficulty sleeping. (*Id.*).

On November 12, 2008, Spear attended an appointment with clinical psychologist Colleen A. Matter ("Matter"), PSYD.  (Tr. 246).  During the appointment, Spear reported that he does not use reminders to maintain his medication administration, but instead relies on his memory to maintain his four-hour schedule.  (*Id.*).  Matter explained that this can lead to a preoccupation with time and pain, and advised Spear to explore ways to externalize medication cues.  (*Id.*).  Matter noted that transportation was a challenge for Spear because he must depend upon others to drive him and because he experiences anxiety in vehicles.  (*Id.*).  Spear reported experiencing reduced nightmares and anxiety around other people, which Matter felt would make treatment in a small group setting a possibility.  (*Id.*).  Matter diagnosed Spear with noncombat military PTSD.  (*Id.*).

On November 13, 2008, Spear met with David Coron ("Coron"), PhD, a licensed psychologist, to undergo an evaluation for PTSD.  (Tr. 189-202).  Spear cited the 2003 accident as the beginning of his PTSD and claimed the physical symptoms resulting from the crash began to develop the same night.  (*Id.*).  Spear reported difficulties sleeping and minor panic attacks when traveling in a vehicle.  (*Id.*).  According to Spear, he has moderate difficulties performing household chores, shopping and exercising due to his physical limitations, but is able to bathe, groom and feed himself without assistance.  (*Id.*).

Upon examination, Coron opined that Spear had unremarkable, slightly slurred speech; cooperative, friendly, relaxed attitude; constricted, blunted and flat affect; hopeless and depressed mood; intact orientation, somewhat ponderous and slow thought processes; unremarkable thought content; good insight and judgment and above average intelligence.  (*Id.*).

According to Coron, Spear was able to complete his serial sevens, although he was slow and arduous when completing the serial sevens backwards. (*Id.*). Spear was able to spell words forwards and backwards. (*Id.*). Spear could only recite five digits forward with consistency and could recall two out of three items after five minutes. (*Id.*).

Coron diagnosed Spear with depressive disorder not otherwise specified and anxiety disorder not otherwise specified. (*Id.*). Coron noted that Spear previously had been diagnosed with PTSD, but the "more prominent clinical feature[] of this evaluation was depression." (*Id.*). Coron assessed Spear's Global Assessment of Functioning ("GAF") to be 50. (*Id.*). Coron opined that in a work setting, Spear would likely be distractible, irritable and unfocused some of the time due to feelings of helplessness related to his pain and discomfort. (*Id.*).

Spear attended another appointment with Matter on December 3, 2008. (Tr. 233). Spear expressed disinterest in changing his pain management routine into a more automated, less memory-reliant one. (*Id.*). He reported sleep difficulties and poor sleep hygiene, but then "stated he was not interested in changing any of his current sleep behaviors and in fact, gets many hours of sleep [throughout] the day and night." (*Id.*). According to Matter, Spear had a depressed mood that appeared to negatively affect his motivation to engage in more behaviorally activating strategies. (*Id.*). In addition, Spear appeared preoccupied with thoughts of his pain. (*Id.*). Spear reported that his inability to drive did not begin immediately after his accident, but began a "year or so" before the time of the appointment. (*Id.*). Matter diagnosed Spear with depression not otherwise specified (due to medical condition) and PTSD. (*Id.*). Spear was scheduled to return to see Matter on March 25, 2009, but missed the appointment with no prior notification. (Tr. 308).

On January 15, 2010, state examiner Dr. Christine Ransom ("Ransom"), PhD, conducted a consultative psychiatric evaluation of Spear.  (Tr. 176-79).  During the evaluation, Spear reported that he lives with his mother, who drove him to the appointment.  (*Id.*).  Spear stated that he was in regular education classes and that had he completed two years of college education.  (*Id.*).  According to Spear, he worked as an engineer for approximately nine years until May 2005, when he stopped working.  (*Id.*).  According to Spear, he was in a car accident that caused him back pain and PTSD.  (*Id.*).

Spear reported that he had been hospitalized for depression and anxiety for five days following the accident and had received outpatient mental health treatment at the VAMC since 2008.  (*Id.*).  According to Spear, he originally received regular mental health treatment, but now treats for check-ups.  (*Id.*).  Spear reported that he experiences nightmares, flashbacks and intrusive thoughts regarding his car accident.  (*Id.*).  In addition, he experiences panic attacks and difficulty sleeping.  (*Id.*).  According to Spear, he is irritable, has difficulty concentrating and has low energy levels.  (*Id.*).  In addition, Spear does not like to be around other people.  (*Id.*).  Spear reported that he can dress, bathe, groom himself, cook and prepare meals, clean, wash laundry and manage money.  (*Id.*).  He is unable to drive, infrequently interacts with his mother and spends his time watching television.  (*Id.*).

Upon examination, Ransom noted that Spear appeared appropriately dressed and walked with a right-sided limp with moderate reliance on a cane.  (*Id.*).  Ransom opined that Spear had slow, halting speech with adequate language, coherent and goal-directed thought processes with no evidence of hallucinations, delusions or paranoia, moderately dysphoric and tense affect, clear sensorium, full orientation, good judgment and insight, and average intellectual functioning with a general fund of information that is appropriate to his experience.

(*Id.*).  Ransom noted that Spear's attention and concentration were moderately impaired by emotional disturbance.  (*Id.*).  Spear could count backwards from 20 and could do two out of three simple calculations, but had difficulty with his serial threes.  (*Id.*).  Ransom found Spear's immediate memory to be moderately impaired.  (*Id.*).  According to Ransom, Spear could remember one out of three objects immediately, three digits forward and three digits backward.  (*Id.*).  Similarly, Ransom found Spear's recent memory to be moderately impaired as he could remember one out of three objects after five minutes.  (*Id.*).  According to Ransom, Spear's remote memory was intact.  (*Id.*).

According to Ransom, Spear could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks and a regular schedule, and learn simple new tasks.  (*Id.*).  Ransom opined that Spear would have moderate difficulty performing complex tasks, relating adequately with others and appropriately dealing with stress due to moderate PTSD, moderate major depressive disorder and moderate anxiety disorder not otherwise specified.  (*Id.*).  According to Ransom, Spear's prognosis was fair to good with more intensive treatment.  (*Id.*).

On February 4, 2010, agency medical consultant Dr. M. Totin ("Totin") completed a Psychiatric Review Technique.  (Tr. 349-62).  Totin concluded that Spear's mental impairments did not meet or equal a listed impairment.  (Tr. 352-53).  According to Totin, Spear suffered from mild limitations in his activities of daily living, ability to maintain social functioning and ability to maintain concentration, persistence or pace.  (Tr. 359).  In addition, according to Totin, Spear had not suffered any episodes of deterioration.  (*Id.*).

Totin completed a mental RFC assessment.  (Tr. 345-48).  Totin opined that Spear suffered from moderate limitations in his ability to understand and remember detailed

instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted, complete a normal workday or week without interruption, accept instructions and respond appropriately to criticism, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain social appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (*Id.*). In addition, Totin opined that Spear was markedly limited in is ability to interact appropriately with the general public. (*Id.*). Totin opined that Spear can follow, understand and execute simple directions and instructions, perform simple tasks, maintain attention and concentration for simple tasks and maintain a simple schedule. (Tr. 361). Accordingly, Totin opined that Spear retained the capacity to understand, remember and carry out simple instructions, use appropriate judgment to make simple work-related decisions, deal with changes in a routine work setting and sustain attention and concentration for a meaningful period in a workday. (*Id.*). Thus, Totin opined that Spear was capable of performing work requiring simple tasks in a low social working environment. (*Id.*).

IV.    **Proceedings before the ALJ**

At the administrative hearing, Spear testified that he had graduated from high school and subsequently enlisted in the military. (Tr. 43-44). According to Spear, he served in the Navy from 1996 until he was honorably discharged in May 2005. (Tr. 44). In the Navy, Spear operated and maintained propulsion boilers and other equipment including mechanical

pumps, which he would take apart and rebuild.  (Tr. 49).  Spear testified that he began to

experience extreme back pain after an automobile accident in 2003, and the Navy subsequently

determined that Spear was unable to perform his duties, due in part to his inability to lift more

than ten pounds or to walk for prolonged periods.  (Tr. 43).  Since that time, Spear has looked

unsuccessfully for other employment.  (Tr. 44-45).  Spear testified that he often failed urinalysis

tests due to the presence of pain narcotics in his blood and that potential employers were deterred

from hiring him because of insurance considerations or because he was physically unable to

perform required duties.  (*Id.*).

Spear testified that his back pain has increased over time and that on good days

his pain level is seven out of ten and on bad days the pain is "extreme" and is a level ten out of

ten.  (Tr. 45).  On bad days, he has difficulty getting out of bed or moving, and his pain is

aggravated by walking and sitting.  (*Id.*).  Spear testified that walking and sitting also aggravates

the pain in his leg, which makes it difficult for him to walk or to stand from a sitting position.

(*Id.*).  Even on good days, according to Spear, he can only sit for one-half hour before needing to

get up and move around or lie down until the pain passes.  (*Id.*).  According to Spear, he has used

a cane to ambulate for the last five years because of his pain and numbness in his left leg.  (Tr.

42).  Although it was not prescribed by a doctor, his doctors have encouraged him to use it.  (*Id.*).

Spear testified that he has previously used a walker to ambulate when he was

experiencing extreme pain and numbness in his left leg and was incapable of supporting his own

weight.  (*Id.*).  According to Spear, the pain and numbness in his leg have increased in severity

over time.  (Tr. 43).  Spear testified that nothing in particular seems to aggravate the pain in his

leg and he has not identified anything that alleviates the pain and numbness.  (*Id.*).

According to Spear, the pain in his back and leg makes his day-to-day routine difficult. (Tr. 45). Spear cannot lift heavy objects; for instance, he has difficulty lifting a gallon of milk. (*Id.*). Cleaning is difficult for Spear because he is unable to bend. (*Id.*). Further, he has difficulty sleeping through the night, which causes fatigue, low energy and difficulty concentrating. (*Id.*). Spear testified that he spends his days watching television or using the computer, but is not able to sit for prolonged periods. (Tr. 48). According to Spear, he has to get up and move around every half hour because his back stiffens when he is seated. (*Id*). In addition, Spear testified that he can only stand for approximately ten minutes before he begins to experience pain in his leg, at which point he needs either to sit or lie down depending upon how severe his pain is that day. (Tr. 48-49).

Spear testified that he has tried several different treatments to alleviate his pain. (Tr. 46-49). He is currently taking Methadone and previously took Percocet and Morphine without relief. (Tr. 46). Spear also tried acupuncture, which initially helped to relieve his pain, but eventually became ineffective. (*Id.*). Spear testified that he was previously told that he was not a candidate for surgical correction, although he has recently been referred to a neurosurgeon for surgical evaluation. (Tr. 46-47). According to Spear, he has also tried physical therapy, but that did not alleviate his pain. (Tr. 49).

In addition to his back and leg pain, Spear testified that he also suffers from PTSD, depression, anxiety and insomnia, high blood pressure and acid reflux. (Tr. 47-48). Spear testified that his high blood pressure and acid reflux are controlled by medication, although his blood pressure fluctuates at times. (*Id.*). Spear testified that he takes Cymbalta for depression and PTSD and to alleviate his pain. (Tr. 47). According to Spear, he used to receive regular counseling for his PTSD, but stopped because it was difficult for him to attend

appointments.  (*Id.*).  Spear testified that his PTSD symptoms are not as severe as they used to be, although he has been advised to return to counseling.  (*Id.*).  Spear takes medication to address his insomnia and uses an oxygen machine when he sleeps, but these treatments do not provide relief.  (Tr. 48).  According to Spear, he typically naps for two to three hours each day. (*Id.*).

A vocational expert, Julie Andrews ("Andrews"), also testified during the hearing. (Tr. 49-52).  The ALJ first asked Andrews whether a person of the same age as Spear, with the same education and vocational profile, who was able to understand, remember and carry out simple instructions, interact appropriately with coworkers and supervisors on a consistent basis, could only work in proximity to but not in conjunction with coworkers, could have less than occasional contact with the general public, could maintain concentration and focus for two hours at a time and who was capable of occasionally carrying or lifting ten pounds and could frequently lift or carry less than ten pounds, could stand or walk at least two hours and sit about six hours in an eight-hour workday, needed to use an assistive device to ambulate, could push or pull up to ten pounds with less than occasional postural limitations, but no ladder, ropes or scaffolding climbing, would be able to perform any of the work that Spear previously performed. (Tr. 50-51).  Andrews opined that such a person would not be able to perform Spear's former position.  (*Id.*).  According to Andrews, such an individual, however, could perform other regional and national jobs.  (*Id.*).  These jobs include preparer, with 82,550 jobs nationally and 465 jobs regionally, and label pinker, with 1.3 million jobs nationally and 455 regionally.  (Tr. 51).  The ALJ then asked whether any jobs would be available if the same individual were unable to sit, stand and walk in combination for at least eight hours in a day.  (*Id.*).  Andrews testified that there would be no jobs available for such an individual on a full-time competitive

employment level. (*Id.*). Counsel for Spear asked whether any jobs would be available for the same individual who needed to walk around the workplace every thirty minutes for a period of five minutes or who needed to take a two hour break during the day. (Tr. 52). Andrews testified that there would be no jobs available for such an individual. (*Id*).

## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and DIB if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.     __The ALJ's Decision__

            In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 20-29).  Under step one of the process, the ALJ found that Spear had not engaged in substantial gainful activity since May 25, 2005, the alleged onset date.  (Tr. 22).  At step two, the ALJ concluded that Spear has the severe impairments of chronic low back pain with left lumbar radiculopathy, PTSD, major depressive disorder, and anxiety disorder.  (*Id.*).  The ALJ found Spear's hypertension, gastroesophageal reflux disease and sleep apnea to be not severe.  (*Id.*).  At step three, the ALJ determined that Spear does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 22-24).  With respect to Spear's mental impairments, the ALJ found that Spear suffered from moderate difficulties in social functioning and maintaining concentration, persistence or pace and mild limitations in activities of daily living.  (*Id.*).  The ALJ concluded that Spear has the RFC to understand, remember and carry out simple instructions and tasks, to interact appropriately with coworkers and supervisors on a consistent basis, to work in proximity to but not in conjunction

with coworkers and have less than occasional contact with the general public, to maintain

concentration and focus for up to two hours at a time, and to perform sedentary work, except that

he could occasionally carry or lift ten pounds and could frequently carry or lift less than ten

pounds, could push or pull up to ten pounds, could stand or walk for at least two hours and could

sit for about six hours in an eight-hour workday, must be permitted to use an assistive device and

is limited to less than occasional postural limitations with no ladder, rope or scaffold climbing.

(Tr. 24). Finally, the ALJ determined that Spear was unable to perform past work, but that –

considering his age, education, work experience, and RFC – jobs existed in significant numbers

in the national economy that Spear could perform. (Tr. 28-29). Accordingly, the ALJ found that

Spear is not disabled. (*Id.*).

      **B.**      **Spear's Contentions**

      Spear contends that the ALJ's determination that he is not disabled is not

supported by substantial evidence. (Docket # 10-1). First, Spear maintains that the ALJ's

mental RFC determination is not supported by substantial evidence because the ALJ erred when

he failed to account for limitations assessed by Ransom, Totin and Coron. (*Id.* at 12-15). Next,

Spear argues that the ALJ failed to develop the record regarding Spear's exertional functional

limitations and the ALJ's RFC assessment thus was not based upon substantial evidence. (*Id.* at

15-18). In addition, Spear contends that the ALJ failed to apply the appropriate legal standards

when assessing Spear's subjective complaints of pain. (*Id.* at 18-20). Finally, Spear maintains

that the testimony of the vocational expert cannot provide substantial evidence at step five

because it was based upon an RFC that did not fully account for Spear's limitations. (*Id.* at

21-22).

II.     **Analysis**

A.      **Mental RFC Assessment**

First, I turn to Spear's contentions that the ALJ's mental RFC assessment is flawed because the ALJ failed to incorporate into the assessment Spear's limitations in his ability to deal with stress and changes in the work environment.  (*Id.* at 12-15).  In addition, Spear maintains that the ALJ's conclusion that Spear could sustain concentration is inconsistent with Totin's and Coron's opinions.  (*Id.*).  Finally, Spear contends that the ALJ erred by failing to consider Coron's GAF assessment.  (*Id.* at 13-14).

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

According to Spear, Ransom opined that he would have moderate difficulties performing complex tasks, relating adequately with others and dealing with stress.  (*Id.* at 13).  In addition, Spear argues that Totin opined that Spear had moderate limitations over twelve categories of work-related mental functions and marked limitation in his ability to interact with

the public.  (*Id.*).  Spear maintains that despite giving significant weight to Ransom's opinion and

limited weight to Totin's opinion, the ALJ overlooked their opinions that Spear would have

difficulty dealing with workplace stress and changes in the work environment.  (*Id.* at 12-15).

        I disagree.  Although both Ransom and Totin opined that Spear had moderate

limitations in certain categories of mental work-related functions, both ultimately concluded that

Spear was capable of understanding simple directions and performing simple tasks

independently.  (Tr. 178, 361).  Despite the moderate limitations assessed by Totin, he opined

that Spear was able to perform simple tasks, maintain attention for simple tasks, make simple

work-related judgments and "deal with changes in the routine work setting."  (Tr. 361).  The ALJ

determined that Spear could understand, remember and carry out simple instructions and tasks

and could maintain concentration for up to two hours.  To address Ransom and Totin's opinions

regarding Spear's limitations dealing with workplace stress and members of the public, the ALJ

incorporated into his RFC limitations that Spear was unable to work in conjunction with

coworkers and should have less than occasional interaction with members of the general public.

Although the ALJ may not have discussed each of the moderate limitations identified by Ransom

and Totin, his RFC assessment accounted for those limitations and was entirely consistent with

their opinions that Spear could perform unskilled work in a low social working environment.

Accordingly, I conclude that the ALJ properly evaluated and incorporated into his RFC

assessment the limitations identified in Ransom's and Totin's opinions, even if he did not

explicitly discuss each limitation.  *See Retana v. Astrue*, 2012 WL 1079229, *6 (D. Colo. 2012)

(ALJ was not required to discuss thoroughly each moderate limitation; "ALJ's RFC adopted

some of [doctor's] moderate limitations such as restricting plaintiff to unskilled work not

involving complex tasks, reflecting plaintiff's moderate limitations in his ability to carry out

detailed instructions and to maintain concentration for extended periods"); *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) ("despite granting little weight to [the doctor's] opinions, [the ALJ] accounted for [p]laintiff's difficulties with concentration and stress in his RFC[;] [t]herefore, had the ALJ opted to grant [the doctor] a greater weight, it would not have affected his RFC").

   Similarly, I reject Spear's contention that the ALJ's conclusion that Spear could sustain concentration for up to two hours is inconsistent with the opinions of Totin and Coron. As an initial matter, I conclude that the ALJ did not err by failing to mention Coron's GAF assessment. Although "GAF scores may be relevant to an ALJ's severity and RFC determinations, . . . the ALJ need not explicitly mention the GAF score." *See Marvin v. Colvin*, 2014 WL 1293509, *2 (N.D.N.Y. 2014) (internal citation omitted). In his decision, the ALJ specifically cited Coron's assessment and recognized that Coron concluded that Spear was "likely to be distractible, irritable and unfocused some of the time at the work place." (Tr. 26 citing Tr. 246).[5] Accordingly, I conclude that the ALJ considered the relevant medical evidence, including Coron's assessment, when conducting his mental RFC analysis and that his failure to explicitly mention Coron's GAF assessment does not require remand. *See id.* ("the court is satisfied that the ALJ properly considered all of the evidence available to him[;] [i]ndeed, the ALJ discussed at length the [consultative opinion] which reflected [claimant's] lowest GAF score").

   In addition, the ALJ recognized that Coron had opined that Spear might be distractible "some of the time at the work place" and then assessed that Spear would be able to sustain concentration for up to two hours. The ALJ's conclusion is entirely consistent with the

---

[5] Although the ALJ quoted Coron's assessment, his decision cites to the last page of the record containing Coron's assessment, instead of the page upon which the quoted material appears. (*Compare* Tr. 245 *with* Tr. 246).

opinion of Totin, who concluded that Spear could "maintain [attention and concentration] for simple tasks" and could "sustain attention and concentration for a meaningful period relative to the work day." (Tr. 361). I conclude that the ALJ's mental RFC assessment was based upon a thorough review of the record, was supported by substantial record evidence and remand is not appropriate. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

### B. Credibility Assessment

I turn next to Spear's contention that the ALJ failed to apply the appropriate legal standard when assessing the credibility of his testimony regarding the intensity, persistence and limiting effects of his pain. (Docket # 10-1 at 18-21).

"Evidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the RFC of a claimant." *Meadors v. Astrue*, 370 F. App'x 179, 185 (2d Cir. 2010). Generally, a claimant's statements of pain or other limitations are not sufficient alone to establish a medically determinable impairment; instead, "plaintiff must demonstrate by medical signs or findings that [he] has a condition that could reasonably be expected to produce the alleged symptoms." *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2003); *Meadors v. Astrue*, 370 F. App'x at 185 ("[a] claimant who alleges a disability based on the subjective experience of pain need not adduce direct medical evidence confirming the extent of the pain, but [instead] medical signs and laboratory findings which show that the claimant has a medical impairment which could reasonably be expected to

produce the pain") (quotations omitted) (alteration in original); *see Skiver v. Colvin*, 2014 WL

800228, *6 (W.D.N.Y. 2014).  "While subjective pain may serve as the basis for establishing

disability, even if such pain is unaccompanied by positive clinical findings, the ALJ is

nonetheless empowered to exercise discretion to arrive at an independent judgment, in light of

medical findings and other evidence, regarding the true extent of the pain alleged by the

claimant." *Taylor v. Barnhart*, 83 F. App'x at 350 (internal quotations and citations omitted).

The regulations provide for a two-step inquiry to evaluate a claimant's

contentions of pain.  *See Meadors*, 370 F. App'x at 183 (citing Social Security Ruling 96-7P,

1996 WL 374186 (S.S.A.); 20 C.F.R. § 404.1529(c)).  The ALJ must first determine whether

"the claimant suffers from a 'medically determinable impairment[] that could reasonably be

expected to produce' the pain alleged."  *See id.* (quoting 20 C.F.R. § 404.1529(c)(1)).  Second,

the ALJ "'must then evaluate the intensity and persistence of [the claimant's] symptoms' to

determine the extent to which the symptoms limit the claimant's capacity for work."  *Cichocki v.

Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (quoting 20 C.F.R. § 416.929(c)(1)).  "To the extent

that the claimant's pain contentions are not substantiated by the objective medical evidence, the

ALJ must engage in a crediblity inquiry."  *Meadors*, 370 F. App'x at 183-84 (citing 20 C.F.R.

§ 404.1529(c)(3)(i)-(vii)).

Accordingly, when the claimant alleges "symptoms of greater severity than can be

established by the objective medical findings, the ALJ will consider other evidence, including

factors such as the daily activities; the nature, extent and duration of symptoms; and the

treatment provided."  *See Skiver v. Colvin*, 2014 WL 800228 at *6 (citing 20 C.F.R.

§ 416.929(c)(3)).  Specifically, the ALJ must assess the claimant's subjective complaints of pain

by evaluating the following factors:

(1)     [the claimant's] daily activities;

(2)     [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(3)     [p]recipitating and aggravating factors;

(4)     [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;

(5)     [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [the claimant's] pain or other symptoms;

(6)     [a]ny measures [the claimant] use[s] or ha[s] used to relieve pain or other symptoms; and

(7)     [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

*Cichocki v. Astrue*, 534 F. App'x at 76 (alterations in original) (quoting 20 C.F.R. § 416.929(c)(3)).  The ALJ should also consider other facts affecting credibility, including the claimant's prior work history.  *Johnson v. Astrue*, 748 F. Supp. 2d 160, 173 (N.D.N.Y. 2010) (citing SSR 96-7P, 1996 WL 374186 (S.S.A.)).

"If, after considering [claimant's] subjective testimony, and the objective medical evidence and any other factors deemed relevant, the ALJ rejects [the claimant's] subjective testimony, he must explain that decision explicitly and with sufficient specificity that a reviewing court may be able to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence."  *Norman v. Astrue*, 912 F. Supp. 2d 33, 43 (S.D.N.Y. 2012) (quotations omitted).  If the ALJ's credibility determination is not sufficiently detailed so as to "permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial

evidence, remand is appropriate." *Frenandez v. Astrue*, 2013 WL 1291284, *18 (E.D.N.Y. 2013).

In his decision, the ALJ recognized his duty to conduct the two-step inquiry. (Tr. 24-25). In conducting the inquiry, the ALJ concluded "after careful consideration of the evidence" that Spear's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 25). After recounting portions of the medical records, including a discussion of the treatment Spear received for his back pain and several images of Spear's spine, and Spear's hearing testimony, including his statements of pain and his daily activities, the ALJ concluded that Spear's "credibility is accepted as considered by treating and examining sources to cause the degree of limitation reported, but not to the extent alleged." (Tr. 27). The ALJ noted that none of Spear's treating sources had determined him to be disabled and had not recommended any "restrictions." (*Id.*). Finally, the ALJ noted that Spear's "treatment has been essentially routine and/or conservative in nature." (*Id.*).

I conclude that the ALJ committed legal error in evaluating Spear's credibility concerning his symptoms of pain. First, the ALJ's decision does not make clear whether he actually considered all of the factors outlined above. In any event, his decision fails to explain his credibility determination "explicitly and with sufficient specificity that a reviewing court may be able to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *See Norman v. Astrue*, 912 F. Supp. 2d at 43-44.

Other than noting that Spear's treating physicians had not offered an opinion as to whether Spear was disabled, the ALJ simply stated that Spear's treatment was both routine and

conservative.  Yet, there is evidence in the record that Spear has undergone injections, physical

therapy, acupuncture and is on a narcotics medication regimen monitored by a pain clinic to

address his back pain and has been recommended for surgical evaluation.  *See Fernandez v.*

*Astrue*, 2013 WL 1291284 at *19 ("[p]laintiff's complaints of his debilitating and constant pain

were supported by objective medical examinations and history of treatments, such as trigger

point injections, monthly chiropractic therapy sessions, and prescribed pain medications").

Further, there is nothing in the decision to indicate that the ALJ considered Spear's work history

preceding the alleged onset of his impairment.  *See Johnson v. Astrue*, 748 F. Supp. 2d at 174

("there is no indication that the ALJ took [p]laintiff's excellent work history into account when

determining that [p]laintiff's claim of being unable to work at this point is only somewhat

credible").

   In essence, the ALJ merely recited the record evidence, but did not adequately

explain why he concluded that Spear's complaints of debilitating pain were not credible.  A

recitation of the evidence, without more, is insufficient to permit this Court to review the ALJ's

credibility determination.  *See Norman*, 912 F. Supp. 2d at 44 ("[t]he recitation of medical

evidence, without more, is not a stand-in for a 'meaningful analysis of how those factors

detracted from [the plaintiff's] credibility'") (quoting *Kerr v. Astrue*, 2010 WL 3907121, *4

(N.D.N.Y.), *report and recommendation adopted*, 2010 WL 3893922 (N.D.N.Y. 2010)).

   Accordingly, I conclude that the ALJ committed legal error by failing to address

the applicable factors and to adequately explain his credibility determination.  *See Fernandez*,

2013 WL 1291284 at *19 ("[t]he ALJ . . . erred in failing to provide any further basis for finding

[p]laintiff not credible and did not evaluate [p]laintiff's testimony in light of the seven factors as

required"); *Norman*, 912 F. Supp. 2d at 44 ("[w]hat is missing from such an analysis is any

explanation as to why [p]laintiff's subjective complaints were found less than fully credible") (internal quotation omitted); *Felder v. Astrue*, 2012 WL 3993594, *15 (E.D.N.Y. 2012) ("[b]ecause the ALJ did not discuss . . . all the applicable factors set forth in 20 C.F.R. § 404.1529(c)(3)(i)-(vii) in making [his] credibility determination analysis, the ALJ has committed legal error"); *Johnson*, 748 F. Supp. 2d at 174 (remanding to permit the ALJ to "provide a more thorough explanation" for his credibility assessment).  A remand for further proceedings under these circumstances is appropriate because this Court is unable to evaluate whether the ALJ's credibility determination is supported by substantial evidence. *Norman*, 912 F. Supp. 2d at 86 ("[b]ecause I find legal error requiring remand, I do not reach the issue of whether the ALJ's decision was supported by substantial evidence").  Because I conclude that the ALJ's credibility assessment was the result of legal error, I am unable to subject the ALJ's physical RFC analysis to meaningful review, and I do not reach Spear's remaining contentions regarding the ALJ's physical RFC assessment or the vocational expert's testimony at step five. *See Meadors*, 370 F. App'x at 185-86 ("[b]ecause we conclude that the ALJ erred in assessing [claimant's] credibility, thereby depriving us of the ability to subject his RFC determination to meaningful review, we do not reach [claimant's remaining contentions]").

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 7**) is **DENIED**, and Spear's motion for judgment on the pleadings (**Docket # 10**) is **GRANTED in Part and DENIED in Part**.  This matter is remanded pursuant

to 42 U.S.C. § 405(g), sentence four, to the Commissioner for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

*s/Marian W. Payson*

_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       September 30, 2014